**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERT WOLTAG and<br>MICHAEL FRECHETTE, individually<br>and on behalf of all others similarly<br>situated,<br><br>               Plaintiff,<br><br>    v.<br><br>COMSTAR, LLC<br><br>               Defendant. | CIVIL ACTION NO. |

## NOTICE OF REMOVAL

To the United States District Court for the District of Massachusetts.

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332(d), 1441, 1446 and 1453, Defendant Comstar, LLC ("Comstar" or "Defendant") respectfully moves this action, captioned *ROBERT WOLTAG and MICHAEL FRECHETTE, individually and on behalf of all others similarly situated v. Comstar, LLC*, Civ. A. No. 2277CV00641, filed in the Essex County (Massachusetts) Superior Court be removed to the United States District Court for the District of Massachusetts, and as grounds therefore state as follows:

## BACKGROUND

1.      On July 13, 2022, Plaintiffs Robert Woltag and Michael Frechette filed a putative Class Action Complaint ("Class Action Complaint") in the Superior Court of Massachusetts – Essex County, captioned *ROBERT WOLTAG and MICHAEL FRECHETTE, individually and on behalf of all others similarly situated v. Comstar, LLC*, Civ. A. No. 2277CV00641 alleging individual and putative class claims. *See* Exhibit A, Class Action Complaint.

1

2.      Plaintiffs allege they are among some of the 68,957 persons who were sent a letter in May 2022 informing them of a data security incident at Comstar that could have resulted in unauthorized access to their personal information by a third-party criminal.[1] *See* Ex. A, Class Action Complaint ¶ 5. Plaintiffs allege two causes of action arising out of the data security incident. They assert, on behalf of themselves and the class: (1) negligence and (2) unjust enrichment. *Id.* ¶¶ 139-189.

3.      The Class Action Complaint does not identify a specific amount of damages sought as relief. Rather, Plaintiffs categorically allege they and the Class suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of their Private Information; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress. *Id.* ¶ 102.

4.      The Class Action Complaint names Comstar as the sole defendant.

5.      Under 28 U.S.C. §§1441(a), 1446 and 1453, the action is removable to this Court because the procedural requirements for removal are satisfied and because this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d), the Class Action Fairness Act of 2005 ("CAFA").

6.      Under 28 U.S.C. §1446(d), promptly after filing this Notice of Removal, Defendant will give written notice to Plaintiffs and to Essex County Superior Court of its filing of this Notice of Removal.

---

[1] The total impacted population was 708,507 individuals. *See* Ex. D, Post Aff., ¶ 4.

## BASIS FOR REMOVAL

### I.    Defendant Satisfied the Procedural Requirements for Removal.

7.     Defendant received a copy of the Class Action Complaint on August 24, 2022, by summons left with its Registered Agent. *See* Exhibit B, Summons. This notice of removal is timely under 28 U.S.C. §1446(b), as it is made within 30 days of Comstar's receipt of the Class Action Complaint.

8.     Venue is proper in this Court because it corresponds to the district and division where this litigation was filed. Essex County Superior Court is located in the District of Massachusetts. *See* 28 U.S.C. §1441(a).

9.     As required under 28 U.S.C. §1446(a), true and correct copies of all process pleadings, and orders served upon Defendant are attached to this notice. *See* Exhibit C.

### II.    This Court has Subject Matter Jurisdiction Under 28 U.S.C. §1332(d).

10.     Under CAFA, this Court has jurisdiction over the putative class action because: (1) the putative class exceeds 100 members; (2) at least one putative class member has a different citizenship from Defendant; and (3) the amount that Plaintiff seeks to recover in class relief exceeds $5 million in the aggregate, exclusive of interest and costs.

#### A.  The Putative Classes Exceed 100.

11.     Under CAFA, a proposed class must consist of at least 100 persons. *See* 28 U.S.C. §1332(d)(5).

12.     Plaintiffs define the Class as those "seek[ing] damages for themselves and other similarly situated consumers or any other person impacted in the data breach at issue." *See* Class Action Complaint ¶ 1.

13.     There are at least 708,507 Class Members. Affidavit of Jeff Post, ¶ 4, attached as Exhibit D. Accordingly, this matter satisfies CAFA's class-size requirement. *See Manson v. GMAC Mortg., LLC*, 602 F. Supp. 2d 289 (D. Mass. 2009).

**B.   There is Minimal Diversity to Establish CAFA Jurisdiction.**

14.     Under CAFA there need only be minimal diversity, which exists where "any member of a class of plaintiffs is a citizen of a State different from any defendant." *See* 28 U.S.C. §1332(d)(2)(A). "Class members" include "named and unnamed" persons that "fall within the definition of the proposed or certified class in a class action." *Id*. at §1332(d)(1)

15.     There are putative class members whose citizenship is diverse from Comstar. *See* Ex. D, Post Aff., ¶ 4. Accordingly, CAFA's requirement of minimal diversity is satisfied here. *See* 28 U.S.C. §1332(d)(2)(A).

**C.   The $5 Million Amount in Controversy Requirement is Satisfied.**

16.     Under CAFA, the aggregate amount in controversy must exceed $5 million exclusive of interest and costs. *See* 28 U.S.C. §1332(d)(2).

17.     "[A] defendant's notice of removal needs to include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014). A defendant's plausible allegations regarding the amount in controversy will ordinarily suffice; however, where the plaintiff contests a removing defendant's showing on the amount in controversy, a court must apply a preponderance of the evidence standard to determine whether the amount in controversy satisfies CAFA's requirements. *Manson v. GMAC Mortg., LLC*, 602 F. Supp. 2d 289 (D. Mass. 2009).

18.     Where the plaintiff has not specifically alleged in the complaint that the amount in controversy is less than the jurisdictional minimum, the challenger to subject matter jurisdiction

has to prove, to a legal certainty, that the amount in controversy cannot exceed the statutory threshold. *Amoche v. Guarantee Tr. Life Ins. Co.*, CIV 07-CV-371-JD, 2008 WL 3843903 (D.N.H. Aug. 14, 2008), aff'd, 556 F.3d 41 (1st Cir. 2009).

19.    Plaintiffs have not specifically alleged that the amount in controversy is less than the jurisdictional minimum.

20.    Plaintiffs allege, on behalf of themselves and the putative class, entitlement to actual damages, statutory damages, consequential damages, attorney's fees, and pre-judgment interest. *See* Class Action Complaint, Counts 1-2. As discussed above, the putative class in this action is at least 708,507 individuals. *See* Ex. D, Post Aff., ¶ 4.

21.    While Defendant maintains that Plaintiffs and the putative class are not entitled to any damages, it is reasonable to draw the conclusion the amount the Plaintiffs seek in relief is more than $5 million given the size of the potential class and the damages alleged by Plaintiff. Even a small amount of damages sought on behalf of each class member would result in an amount in controversy exceeding $5 million in the aggregate.

22.    Accordingly, the total amount in controversy would exceed CAFA's $5 million jurisdictional threshold. *See e.g., Manson*, 602 F. Supp. 2d at 293.

**D.  There Exists Two Additional Class Action Matters in this Court.**

23.    There are two class action complaints filed in this Court: *Greg Davis*, *on behalf of himself and all others similarly situated v. Comstar, LLC*, Civ. A. No. 1:22-CV-11119-PBS and *Andrew Basinas, on behalf of himself and all others similarly situated v. Comstar, LLC*, Civ. A. No. 1:22-CV-11122-RWZ. Only the *Davis* Complaint has been served on Comstar.

24.    Although not ripe at this stage, when removal is allowed, Defendant will move to consolidate this matter and the two federal court class action matters.

25.     "The threshold issue" in determining whether to consolidate cases under Rule 42(a), Fed. R. Civ., "is whether the two proceedings involve a common party and common issues of fact or law." *Seguro De Servicio De Salud De Puerto Rico v. McAuto Systems Group, Inc.*, 878 F.2d 5, 8 (1st Cir.1989). "Once this determination is made, the trial court has broad discretion in weighing the costs and benefits of consolidation to decide whether that procedure is appropriate." *Seguro De Servicio De Salud De Puerto Rico v. McAuto Systems Group, Inc.*, 878 F.2d at 8. In considering the costs and benefits of consolidation, it is appropriate to consider and weigh the convenience or inconvenience to the parties, the judicial economy, the savings in time, effort or expense and "any confusion, delay or prejudice that might result from consolidation." *Data General Corporation v. Grumman Systems Support Corporation*, 834 F.Supp. 477, 487 (D.Mass.1992); *Tower of Cranes of America v. Public Service Company of New Hampshire*, 702 F.Supp. 371, 376 (D.N.H.1988) (court weighs "savings of time and effort that consolidation would produce against any inconvenience, delay or expense that would be caused to the parties and to the Court"). Absent "demonstrable prejudice," consolidation is generally allowed. *Gilliam v. Fid. Mgt. & Research Co.*, CIV.A. 04-11600NG, 2005 WL 1288105 (D. Mass. May 3, 2005).

26.     Here, the two other lawsuits assert essentially the same claims and seek class certification. In the interest of judicial economy, the savings in time, effort, and expense, and to avoid the risk of inconsistent outcomes, the Defendant expects to move the Court to consolidate all three matters once this is case is removed.

## CONCLUSION

27.     Wherefore, because Defendant has demonstrated that all prerequisites for CAFA jurisdiction have been met, this matter is properly removable.

**WHEREFORE**, Defendant respectfully requests that this Court exercise its CAFA jurisdiction over this action and accept the removal of the Class Action Complaint.

Respectfully submitted,

Comstar, LLC

By its attorneys,

*/s/ Michael P. Giunta*
Michael P. Giunta, BBO# 543768
Sean Andrés Rapela, BBO# 709630
Freeman Mathis & Gary, LLP
60 State Street, Suite 600
Boston, Massachusetts 02109
Tel: (617) 963-5974
mgiunta@fmglaw.com
sean.rapela@fmglaw.com

## CERTIFICATE OF SERVICE

I, Sean Andrés Rapela, hereby certify that on September 16, 2022, this document, filed

through the ECF system, will be served via email and first class mail, postage prepaid, upon:

Randi Kassan
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
100 Garden City Plaza, Suite 500
Garden City, New York 11530
(212) 594-5300
rkassan@milberg.com

GARY M. KLINGER*
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
227 w. Monroe Street, Suite 2100
Chicago, IL 60606
(866) 252-0878
gklinger@milberg.com

*/s/ Sean Andrés Rapela*
Sean Andrés Rapela

# Exhibit A

# COMMONWEALTH OF MASSACHUSETTS
## ESSEX, SUPERIOR COURT DEPARTMENT

| | |
|---|---|
| ROBERT WOLTAG and MICHAEL FRECHETTE, individually and on behalf of all others similarly situated, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **RECEIVED** |
| COMSTAR, LLC, | 7/14/2022 |
| Defendant. | |

Plaintiffs Robert Woltag and Michael Frechette ("Plaintiffs") bring this Class Action Complaint (the "Action") against Comstar, LLC ("Comstar" or "Defendant") for damages, equitable relief, and injunctive relief, as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1.      Plaintiffs bring this Action against Comstar, LLC d/b/a Comstar Ambulance Billing Service, a New England-based "[a]mbulance billing, [c]ollection, [c]onsulting, ePCR [h]osting and [c]lient/[p]atient service to municipal and non-profit ambulance service,"[1] to seek damages for themselves and other similarly situated consumers or any other person impacted in the data breach at issue ("Class Members"), who they seek to represent with respect to damages, as well as other equitable relief, including, and without limitation, injunctive relief designed to protect the very sensitive information of Plaintiffs and Class Members. This very sensitive information is provided by the consumer for ambulance and/or healthcare related services and maintained by Defendant for its own pecuniary gain. Defendant acquires the sensitive and private information of

---

[1] https://www.comstarbilling.com, (last accessed June 30, 2022).

consumers directly from individuals or from municipalities and healthcare entities that use its services. Defendant also acquires consumer information through the course of its debt collection and account servicing activities[2]

2.      This Action arises from a data breach (hereinafter, the "Data Breach") in which Defendant exposed a trove of very sensitive information, (collectively, the "Private Information"), inclusive of Personally Identifiable Information ("PII"), specifically names, dates of birth, drivers' license information, and Social Security numbers; and Protected Health Information ("PHI"), specifically information regarding medical assessments, medication administration, and health insurance information; as well as financial account information.[3]

3.      Despite Defendant's statement that "security of information in Comstar's care is one of [Comstar's] highest priorities and [Comstar has] strict security measures to protect information in [Comstar's] care," Comstar failed to provide timely, accurate, and adequate notice to Plaintiffs and Class Members whose Private Information was compromised in the Data Breach alleged herein. Specifically:

      a.   With respect to timeliness, Defendant's *Notice*, was disseminated on May 25, 2022, nearly two months after Comstar first discovered suspicious activity on their servers and over a month after the investigation by Comstar concluded that unauthorized accesses of its servers had occurred;

      b.   With respect to accuracy, Defendant's *Notice* fails to apprise affected individuals of the scope of the intrusions and only states that "the investigation was unable to confirm what specific information" belonging to Plaintiffs and Class Members was "subject to unauthorized access"; and,

      c.   With respect to adequacy, Defendant's *Notice* does not state how the Data

---

[2] https://www.wilmingtonma.gov/home/news/comstar-ambulance-billing-security-breach, (last accessed June 30, 2022).
[3] Notice of Data Incident (May 25, 2022), (hereinafter, the "*Notice*"), at https://secureservercdn.net/45.40.146.94/15b.604.myftpupload.com/wp-content/uploads/2022/06/noticeofdataevent_06162022.pdf, (last accessed June 30, 2022).

Breach occurred, how long the Data Breach lasted, when the Data Breach began, and other pertinent information.

4.     As a result of this delayed response, Plaintiffs and Class Members were unaware that their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. Additionally, the failure of Defendant to specify what information was actually viewed and/or exfiltrated from its systems prevents Plaintiffs and members of the Class from taking proper remedial efforts.

5.     On or about May 25, 2022, Defendant began notifying consumers (via the Notice posted on its website), the Department of Health and Human Services ("HHS"), state Attorneys General and other Class Members about a widespread data breach involving sensitive PII of approximately 68,957 individuals. As Defendant explained in its required notice letter, it discovered that its network had been breached by an "unauthorized individual." Defendant admits in its notice letter that, as a result of its failure to protect consumer information, the cybercriminal(s) "acquired" the Private Information of Class Members, including Plaintiffs.

6.     Plaintiffs and Class Members' unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions, and due to its utter failure to protect Class Members' sensitive data. Hackers obtained consumers' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The risks to these persons will remain for their respective lifetimes.

7.     Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect consumers' Private Information; (ii) warn consumers of its inadequate information security practices; and (iii) effectively monitor Defendant's network for security vulnerabilities and incidents. Defendant's conduct amounts, at least, to negligence and violates federal and state statutes.

8.     Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include, but are not limited to: (i) lost or diminished value of Private

Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; change their usernames and passwords on their accounts; investigate, correct and resolve unauthorized debits; deal with spam messages and e-mails received subsequent to the Data Breach, (v) charges and fees associated with fraudulent charges on their accounts, and (vi) the continued and certainly an increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information. These risks will remain for the lifetimes of Plaintiffs and Class Members.

9.      Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or at the very least negligently failing to take and implement adequate and reasonable measures to ensure that its customers' Private Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to damages, injunctive and other equitable relief.

## II. PARTIES

### Plaintiff Robert Woltag

10.      Plaintiff Robert Woltag is a resident and citizen of the commonwealth of Massachusetts. Plaintiff Woltag resides in Massachusetts and received the *Notice* related to the Data Breach as alleged herein on or about June 7, 2022.

### Plaintiff Michael Frechette

11.      Plaintiff Michael Frechette is a resident and citizen of the commonwealth of

Massachusetts. Plaintiff Frechette resides in Massachusetts and received the *Notice* related to the Data Breach as alleged herein on or about June 7, 2022.

### Defendant Comstar, LLC

12.     Defendant Comstar, LLC is an ambulance billing service and consumer account servicer incorporated in Massachusetts and with its principal place of business in Rowley, Massachusetts.

## III. JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this case because the amount in controversy exceeds the sum of $50,000.00.

14.     This Court has personal jurisdiction over Defendant because Defendant transacts business, contracts to supply services, and has caused tortious injury by act or omission within the Commonwealth of Massachusetts and within Essex County. In addition, Defendant is a corporation in good standing with a majority (if not all) of its business in the Commonwealth of Massachusetts, thus rendering the exercise of personal jurisdiction by this Court necessary and proper.

15.     Venue is proper in Essex County because Defendant has its principal place of business and conducted the activities that gave rise to this claim in this county.

## IV. FACTUAL ALLEGATIONS

### Defendant's Business

16.     Defendant Comstar, LLC d/b/a Comstar Ambulance Billing Service is a New England-based "[a]mbulance billing, [c]ollection, [c]onsulting, ePCR [h]osting and [c]lient/[p]atient service to municipal and non-profit ambulance service."[4]

---

[4] https://www.comstarbilling.com, (last accessed June 30, 2022).

17.     In the course of doing business, Comstar collects very sensitive information about consumers including their private information.

18.     This very sensitive information is provided by the consumer for ambulance-related and healthcare related services; or, in some cases is provided by entities like municipalities that contract for Defendant's services, including its debt collection activities.[5]

19.     According to Comstar's Privacy Policy (hereinafter, the "Policy"), which can be found on Defendant's website, effective April 14, 2003 and revised February 11, 2013, consumer "health information is personal, and Comstar is committed to protecting it. [Comstar is] required by law to maintain the privacy of health information that could be [identifying.]"[6] However, Comstar fails to state what private information that it collects with respect to specific Class Members in its Policy – and because much of the information that Comstar collects on Class Members comes from municipalities or other entities that contract with Defendant, Class Members are unaware as to exactly what information Comstar maintains and what Comstar allowed to be accessed in the Data Breach.

20.     Because the set of data that was exposed in the Data Breach is identified in Defendant's *Notice*, it can be assumed that Comstar collects the following consumer data : names, dates of birth, drivers' license information, Social Security numbers, medical assessments, medication administration, health insurance information; and financial account information.[7]

21.     The Privacy Policy fails to discuss how Constar uses consumer PII, but they do

---

[5] https://www.wilmingtonma.gov/home/news/comstar-ambulance-billing-security-breach, (last accessed June 30, 2022).

[6] https://www.comstarbilling.com/privacy-policy/, (last accessed Jul. 1, 2022)(hereinafter, the "*Policy*").

[7] Notice of Data Incident (May 25, 2022), (hereinafter, the "*Notice*"), at https://secureservercdn.net/45.40.146.94/15b.604.myftpupload.com/wp-content/uploads/2022/06/noticeofdataevent_06162022.pdf, (last accessed June 30, 2022).

address how they "use or disclose … PHI," uses and disclosures that require written consent, rights with respect to PHI, notification in the event of an unauthorized use or disclosure, as well as contact information.

22.    With respect to uses and disclosures that require written consent, Defendant states, "Any…. use or disclosure of PHI… will be made with your written authorization."[8] However, in this Data Breach, Plaintiffs and Class Members did not consent to use or disclosure of PHI to the unauthorized actors who accessed the Private Information discussed herein.

23.    With respect to notification of an unauthorized use or disclosure, Defendant states, "that notification… must contain…. "a description of the unauthorized use or disclosure, including the unauthorized use of date or its discovery, if known" as well as "a description of the type of unsecured PHI that was used or disclosed." However, Defendant's Notice fails to do either: the Notice fails to provide the dates of unauthorized use and the Notice does not say exactly what PHI was subject to use or disclosure.[9]

24.    Thus, Defendant's *Notice* does not abide by their own Privacy Policy.

25.    Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including HIPAA.

26.    The patient information held by Defendant in its computer system and network included the Private Information of Plaintiffs and Class Members. Defendant voluntarily assumed custody of Plaintiffs' and Class members' PII and PHI for its own profit. Defendant was aware of its obligations, particularly with respect to consumer PHI, as demonstrated by its Privacy

---

[8] *Policy.*
[9] *Notice.*

Policy.

27.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

28.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

29.     Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

### The Data Breach

30.     Publicly, on May 25, 2022 via a "Notice of Data Event" posted on its website and disseminated to affected individuals by mail, Comstar disclosed that actors with "unauthorized access" accessed "certain systems on [Comstar's] network."[10] The *Notice* did not state when the unauthorized access began or when the unauthorized access ended, only that Comstar discovered it on or about March 26, 2022 and "took steps to secure [Comstar's] network."[11]

31.     In this *Notice*, Defendant publicly stated the Private Information "varied by individual but may have included" the following information: name, date of birth, medical assessment and medication administration, health insurance information, driver's license, financial account information, and Social Security number.[12]

---

[10] *Notice.*
[11] *Id.*
[12] *Id.*

32.     Comstar reported that approximately 68,957 victims had their Private Information exposed in the Data Breach.[13]

33.     It is likely the Data Breach was targeted at Defendant due to its status as a healthcare related entity that collects, creates, and maintains both PII and PHI.

34.     Upon information and belief, the targeted Data Breach was expressly designed to gain access to private and confidential data, including (among other things) the PII and PHI of patients like Plaintiffs and the Class Members.

35.     Because of the Defendant's failure to properly safeguard Plaintiffs' and Class Members' Private Information, data thieves were able to gain unauthorized access to Defendant's IT systems and were able to compromise, access, and acquire the protected Private Information of Plaintiffs and Class Members.

36.     Defendant had obligations created by HIPAA, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

37.     Defendant's data security obligations were particularly important and should have been apparent given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

38.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[14] Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[15] The 330

---

[13] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, (last accessed Jul. 7, 2022).

[14] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

[15] *Id.*

reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[16]

39.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

40.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

41.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[18]

42.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[16] *Id.*
[17]     FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-  secret-service-warn-of-targeted-ransomware (last visited Jan. 25, 2022).
[18] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

### *Defendant Fails to Comply with FTC Guidelines*

43.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

44.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[19] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

45.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

46.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and

---

[19] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 15, 2021).

[20] *Id.*

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47.    These FTC enforcement actions include actions against healthcare related providers like Defendant. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

48.    Defendant failed to properly implement basic data security practices.

49.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

50.    Die to the nature of the information Defendant chose to custody Defendant was at all times fully aware of its obligation to protect the PII and PHI of consumers. As an entity that custodies PHI and PII Defendant was also aware of the significant repercussions that would result from its protect that information from unauthorized access.

### Defendant Fails to Comply with Industry Standards

51.    Experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

52.    Several best practices have been identified that at a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

53.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

54.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

55.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach and the resulting harm to Plaintiffs and the Class.

### *Defendant Fails to Comply with HIPAA*

56.    HIPAA requires covered entities like Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information.

57.    Covered entities (including Defendant) must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical,

and administrative components.

58.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

59.     A Data Breach such as the one Defendant experienced is also considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40

60.     Data breaches where an unauthorized individual gains access to PHI are also Security Incidents under HIPAA because they impair both the integrity (data is not interpretable) and availability (data is not accessible) of patient health information:

> The presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule. A security incident is defined as the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. See the definition of

security incident at 45 C.F.R. 164.304. Once the ransomware is detected, the covered entity or business associate must initiate its security incident and response and reporting procedures. See 45 C.F.R.164.308(a)(6).[21]

61.     Similarly,

62.     Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards and standards of care mandated by HIPAA regulations.

### Defendant's Breach

63.     Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

     a.     Failing to maintain an adequate data security system to reduce the risk of data breaches;

     b.     Failing to adequately protect patients' Private Information;

     c.     Failing to properly monitor its own data security systems for existing intrusions;

     d.     Failing to train its employees in the proper handling of emails containing the means by which the cyberattacks were able to first access Defendant's networks, and to maintain adequate email security practices;

     e.     Failing to put into place proper procedures, software settings, and data

---

[21] *See* https://www.hhs.gov/sites/default/files/RansomwareFactSheet.pdf at 4.

security software protections to adequately protect against a blunt force intrusion;

f.  Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l.   Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

m.   Failing to train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.   Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption);

o.   Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

p.   Failing to adhere to industry standards for cybersecurity.

64.   As the result of antivirus and malware protection software in dire need of security updating, inadequate procedures for handling phishing emails or emails containing viruses or other malignant computer code, and other failures to maintain its networks in configuration that would protect against cyberattacks like the ransomware intrusion here, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access and compromise Defendant's IT systems, which contained unsecured and unencrypted Private Information.

65.   Accordingly, as outlined below, Plaintiffs and Class Members now face an increased

risk of fraud and identity theft.

### *Data Breaches Cause Disruptions and Put Consumers at Risk*

66.    Data breaches at healthcare related providers like Defendant are especially problematic because the breaches can negatively impact the overall daily lives of individuals affected by the attack.

67.    For instance, loss of access to patient histories, charts, images, and other information forces providers to limit or cancel patient treatment because of the disruption of service.

68.    This leads to a deterioration in the quality of overall care patients receive at facilities affected by data breaches.

69.    Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[22]

70.    Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[23]

71.    Similarly, data breach incidents cause patients issues with receiving care that rise above the level of mere inconvenience. The issues that patients encounter as a result of such incidents include, but are not limited to:

   a.   rescheduling their medical treatment;

---

[22] *See* Nsikan Akpan, Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart- attacks (last visited Jan. 25, 2022).

[23] *See* Sung J. Choi et al., Cyberattack Remediation Efforts and Their Implications for Hospital Quality, 54 Health Services Research 971, 971-980 (2019). Available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited Jan. 25, 2022).

    b.   finding alternative medical care and treatment;

    c.   delaying or foregoing medical care and treatment;

    d.   undergoing medical care and treatment without medical providers having access to a complete medical history and records; and

    e.   inability to access their medical records.[24]

72.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25]

73.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, taking over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such

---

[24] *See, e.g.,* Lisa Vaas, Cyberattacks Paralyze, and Sometimes Crush, Hospitals, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals// (last visited Jan. 25, 2022); Jessica David, Data Breaches Will Cost Healthcare $4B in 2019. Threats Outpace Tech, Health IT Security (Nov. 5, 2019), https://healthitsecurity.com/news/data-breaches-will-cost-healthcare-4b-in-2019-threats-outpace-tech - :~:text=November 05, 2019 - Healthcare data,per each breach patient record (last visited Jan. 25, 2022).

[25] *See* U.S. Gov. Accounting Office, GAO-07-737, "Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown" (GOA, 2007). Available at https://www.gao.gov/new.items/d07737.pdf. (last visited Jan. 25, 2022).

as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

74.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

75.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

76.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

77.    A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[27]

---

[26] *See* IdentityTheft.gov, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Jan. 25, 2022).
[27] *See* Jason Steele, Credit Card and ID Theft Statistics, CreditCards.com (Oct. 23, 2020) https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php. (last visited Jan. 25, 2022).



78.    Moreover, theft of Private Information results in the loss of a valuable property right.[28]

79.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

80.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment,

---

[28] *See*, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

insurance and payment records, and credit report may be affected."[29]

81.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

82.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

83.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held
> for up to a year or more before being used to commit identity theft. Further, once
> stolen data have been sold or posted on the Web, fraudulent use of that
> information may continue for years. As a result, studies that attempt to measure
> the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

84.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

85.    There is a strong probability that entire batches of stolen information have been

---

[29] *See* Federal Trade Commission, What to Know About Medical Identity Theft, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft    identity-theft (last visited Jan. 25, 2022).

dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

86.    Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

87.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[30] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

88.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[31] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[32] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

89.    Moreover, it is not an easy task to change or cancel a stolen Social Security number.

90.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be

---

[30] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Jan. 25, 2022).
[31] Identity Theft and Your Social Security Number, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 25, 2022).
[32] *Id*. at 4.

effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

91.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

92.     Medical information is especially valuable to identity thieves.

93.     According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016 – the same as a Facebook account.[33] That pales in comparison with the asking price for medical data, which was selling for $50 and up.[34]

94.     Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

95.     For this reason, Defendant knew or should have known about these dangers and strengthened its data security accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### Plaintiffs' and Class Members' Damages

96.     To date, Defendant has done nothing to provide Plaintiffs and the Class Members with relief for the damages they have suffered as a result of the Data Breach. According to the *Notice*, Defendant will not even offer credit monitoring or identity theft protection services to the victims of the Data Breach. Instead, Defendant tells affected individuals "[w]e are notifying

---

[33] *See* Omri Toppol, Email Security: How You Are Doing It Wrong & Paying Too Much, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last visited Jan. 25, 2022).
[34] *See* Vaas, Cyberattacks, *supra*, n. 28.

potentially impacted individuals, including you, so that you may take steps to help protect your information, should you feel it is appropriate to do so." This despite telling consumers in the same letter to "remain vigilant against incidents of identity theft" and to consider placing fraud alerts and credit freezes on their accounts. Clearly, Defendant recognizes the imminent and actual harm faced by Plaintiffs and members of the Class even if it does nothing to mitigate that harm.

97.    Plaintiffs and Class Members will be required to pay for credit monitoring or identity theft protection services out of their own pocket. The cost for credit monitoring to consumers can be as much as $360 per year for many years.[35] Moreover, Defendant's refusal to mitigate the fallout from the Data Breach means that Plaintiffs and Class Members will be required to devote more time and effort to remedy the effects than they otherwise must.

98.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

99.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, and similar identity theft.

100.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

101.    Plaintiffs and Class Members will also incur out-of-pocket costs for protective

---

[35] https://compliancy-group.com/the-hidden-costs-of-a-data-breach/

measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

102.    Plaintiffs and Class Members suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of their Private Information, a form of property that Defendant obtained from Plaintiffs and Class Members; (b) violation of their privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

103.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

   a.  Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

   b.  Purchasing credit monitoring and identity theft prevention;

   c.  Placing "freezes" and "alerts" with reporting agencies;

   d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

   e.  Contacting financial institutions and closing or modifying financial accounts; and

   f.  Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized

activity for years to come.

104.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

### Plaintiffs' Experiences

### Plaintiff Woltag's Experience

105.    Plaintiff Woltag's information came into the custody of Defendant and was compromised in the Data Breach.

106.    Since the Data Breach, Plaintiff Woltag has had an increase in fraud alerts and has had to correspond with credit reporting agencies as a result of these fraud alerts.

107.    Plaintiff Woltag has spent a significant number of hours reviewing his bank accounts, contacting his bank, and contacting other businesses, and will continue to spend valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

108.    Additionally, Woltag is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

109.    Plaintiff stores any documents containing his sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

110.    Plaintiff suffered actual injury from having his PII and PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of PII

and PHI, a form of property that Defendant obtained; (b) violation of privacy rights;(c) the likely theft of PII and PHI; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

111.    As a result of the Data Breach, Plaintiff Woltag has also suffered emotional distress as a result of the release of his PII and PHI, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of identity theft and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

112.    As a result of the Data Breach, Plaintiff Woltag anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Woltag will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

113.    Plaintiff Woltag has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of unauthorized third parties and possibly criminals.

114.    Plaintiff Woltag has a continuing interest in ensuring that his PII and PHI, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Frechette's Experience*

115.    Plaintiff Frechette's information came into the custody of Defendant and was compromised by way of the Data Breach.

116.    Plaintiff Frechette has spent a significant number of hours reviewing his bank

accounts, contacting his bank, and contacting other businesses, and will continue to spend valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

117.    Additionally, Plaintiff Frechette is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

118.    Plaintiff Frechette stores any documents containing his sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

119.    Plaintiff Frechette suffered actual injury from having his PII and PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of PII and PHI, a form of property that Defendant obtained; (b) violation of privacy rights;(c) the likely theft of PII and PHI; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

120.    As a result of the Data Breach, Plaintiff Frechette has also suffered emotional distress as a result of the release of his PII and PHI, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of identity theft and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

121.    As a result of the Data Breach, Plaintiff Frechette anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Frechette will continue to be at present, imminent, and continued

increased risk of identity theft and fraud for years to come.

122.    Plaintiff Frechette has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of unauthorized third parties and possibly criminals.

123.    Plaintiff Frechette has a continuing interest in ensuring that his PII and PHI, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

124.    Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated:

125.    The Class that Plaintiffs seek to represent is defined as follows:

All persons residing in the United States whose Private Information was compromised in the Data Breach announced by Defendant on or about May 25, 2022 (the "Class").

126.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

127.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

128.    **Numerosity**. The members of the Class are so numerous that joinder of all

members is impracticable. Defendant has identified and sent notice to approximately 68,957 persons whose Private Information may have been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendant's records.

129.    **Commonality and Predominance.** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.   Whether Defendant had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.   Whether Defendant had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.   Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.   When specifically Defendant actually learned of the Data Breach;

f.   Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.   Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities which

permitted the Data Breach to occur;

j. Whether Plaintiffs and Class Members are entitled to actual damages, nominal damages, and/or punitive damages as a result of Defendant's wrongful conduct;

k. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct, and;

l. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

130.    Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiffs seeks to enforce, on behalf of themselves and the other members of the Class, in that all the Plaintiffs and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

131.    **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

132.    **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to that of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the

damages he has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

133.    **Superiority.** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against corporations. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

134.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

135.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

136.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

137.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

138.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## VI. CAUSES OF ACTION

### FIRST COUNT

### NEGLIGENCE

(On behalf of Plaintiffs and the Class)

139.    Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

140.    As a condition of any person or entity using the services of Defendant, Class Members are obligated to (or an entity provides) provide Defendant with certain Personally Identifiable Information, specifically name, date of birth, driver's license information, and Social Security number; Protected Health Information, specifically medical assessment, medication administration, and health insurance information; as well as financial account information.

141.    Defendant's acceptance and maintenance of this information is for its own pecuniary gain and as part of its regular business activities.

142.    Plaintiffs and Class Members, and the entities that provided said PII – such as a municipality, entrusted this Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

143.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

144.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of their consumers' Private Information involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

145.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' information in Defendant's possession was adequately secured and protected.

146.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' Private Information.

147.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly in light of Defendant's business as a financial services firm, for which the diligent protection of Private Information is a continuous forefront issue.

148.    Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew of should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class, the

critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

149.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiffs' and Class Members' Private Information, including basic encryption techniques freely available to Defendant.

150.    Plaintiffs and Class Members had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

151.    Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

152.    Defendant had and continues to have a duty to adequately and promptly disclose that the PII of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

153.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiffs and Class Members.

154.    Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

155.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and Class Members during the time the Private Information was within Defendant's possession or control.

156.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

157.     These foregoing frameworks are existing and applicable industry standards in the financial services industry, and Defendant failed to comply with these accepted standards thereby opening the door to the cyber incident and causing the data breach.

158.     Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

159.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect consumers' Private Information in the face of increased risk of theft.

160.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its consumers' Private Information.

161.     Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

162.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

163.     There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiff and Class. Plaintiffs' and Class Members' Private Information was lost and accessed as the proximate result of Defendant's failure to exercise

reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

164.    Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach or data breach.

165.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare, dental, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

166.    Defendant's violation of 45 C.F.R. § 164.530(c)(l) and related HIPAA provisions constitutes negligence *per se*.

167.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

168.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

169.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

170.    Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

171.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class.

172.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of consumers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (ix) the diminished value of Defendant's goods and services they received.

173.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

174.    Additionally, as a direct and proximate result of Defendant's negligence and

negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

## SECOND COUNT

### UNJUST ENRICHMENT

(On behalf of Plaintiffs and the Class)

175.    Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

176.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

177.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

178.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents or contracting partners and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

179.    Defendant was aware that any payment for its services from entities that provided consumer information was intended for it on behalf of the consumer as each individual for which Defendant maintained private information was identifiable via the information Defendant collected.

180.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

181.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures.  Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

182.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

183.    Defendant failed to secure Plaintiffs and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

184. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

185. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

186. Plaintiffs and Class Members have no adequate remedy at law.

187. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

188.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

189.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## VII. PRAYER FOR RELIEF

190.    Plaintiffs demand a trial by jury on all claims so triable.

## VIII. JURY TRIAL DEMAND

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected

through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.     requiring Defendant to conduct regular database scanning and securing checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal

identifying information to third parties, as well as the steps affected individuals

must take to protect themselves;

xvi.    requiring Defendant to implement logging and monitoring programs sufficient

to track traffic to and from Defendant's servers; and for a period of 10 years,

appointing a qualified and independent third party assessor to conduct a SOC 2

Type 2 attestation on an annual basis to evaluate Defendant's compliance with

the terms of the Court's final judgment, to provide such report to the Court and

to counsel for the class, and to report any deficiencies with compliance of the

Court's final judgment;

D.    For an award of damages, including actual, nominal, statutory, and consequential

damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

DATED:    July 13, 2022

Respectfully submitted,

*s/ Randi Kassan*

RANDI KASSAN

**MILBERG COLEMAN BRYSON**

**PHILLIPS GROSSMAN, PLLC**

100 Garden City Plaza, Suite 500

Garden City, New York 11530

Phone: (212) 594-5300

rkassan@milberg.com


GARY M. KLINGER*

**MILBERG COLEMAN BRYSON**

**PHILLIPS GROSSMAN, PLLC**

227 W. Monroe Street, Suite 2100

Chicago, IL 60606

Phone: (866) 252-0878

gklinger@milberg.com

*ATTORNEYS FOR PLAINTIFFS*

# Exhibit B

| | | |
|---|---|---|
| **Summons** | CIVIL DOCKET NO.<br>2277CV00641 | **Trial Court of Massachusetts**<br>**The Superior Court** |

| | |
|---|---|
| CASE NAME:<br>Robert Woltag, et al Individually and on<br>behalf of all others similarly Situated<br><br>vs.<br><br>Comstar LLC | Thomas H. Driscoll, Jr.        Clerk of Courts<br>Essex                                County<br>COURT NAME & ADDRESS.<br>Essex Superior Court<br>TRUE ATTEST COPY<br><br>DEPUTY SHERIFF |
| Plaintiff(s) | |
| Defendant(s) | |

THIS SUMMONS IS DIRECTED TO ___Comstar LLC___ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the   Essex  Superior              Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

**2. How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a) Filing your **signed original** response with the Clerk's Office for Civil Business,  Essex Superior              Court
   43 Appleton Way, Lawrence, MA 01841   (address), by mail or in person **AND**
   b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
   Randi A. Kassan, Milberg, Coleman, Bryson, Phillips, Grossman
   100 Garden City Plaza, Suite 500
   Garden City, NY 11530

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.



3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

## 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

## 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____ , Chief Justice on _____ , 20__  (L.S.)

Clerk-Magistrate  Thomas H. Driscoll, Jr.

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____                Signature: _____

**N.B.  TO PROCESS SERVER:**

  PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date: _____

rev. 7/21

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 2277CV00641 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Robert Woltag Individually and in his/her capacity And on behalf of all others similarly situated et al vs. Comstar, LLC | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| TO: Randi A Kassan, Esq. Milberg Coleman Bryson Phillips Grossman, LLC 100 Garden City Plaza Suite 500 Garden City, NY 11530 | COURT NAME & ADDRESS Essex County Superior Court - Lawrence 43 Appleton Way Lawrence, MA 01841 |
|---|---|

## TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                           **DEADLINE**

|  | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court |  | 10/12/2022 |  |
| Response to the complaint filed (also see MRCP 12) |  | 11/14/2022 |  |
| All motions under MRCP 12, 19, and 20 | 11/11/2022 | 12/12/2022 | 01/10/2023 |
| All motions under MRCP 15 | 09/07/2023 | 10/10/2023 | 10/10/2023 |
| All discovery requests **and depositions** served and non-expert depositions completed | 07/03/2024 |  |  |
| All motions under MRCP 56 | 08/02/2024 | 09/02/2024 |  |
| Final pre-trial conference held and/or firm trial date set |  |  | 12/30/2024 |
| Case shall be resolved and judgment shall issue by |  |  | 07/14/2025 |

**The final pre-trial deadline is not the scheduled date of the conference.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 07/14/2022 | ASSISTANT CLERK Stefano J Cornelio | PHONE (978)242-1900 |
|---|---|---|

Date/Time Printed: 07-14-2022 09:34:40                                                        SCV026\ 08/2016

# Exhibit C

| **Summons** | CIVIL DOCKET NO.<br>2277CV00641 | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

CASE NAME:
Robert Woltag *et al*, Individually and on
behalf of all others similarly Situated

Plaintiff(s)

VS.

Comstar LLC

Defendant(s)

Thomas H. Driscoll, Jr.          Clerk of Courts

Essex                                          County

COURT NAME & ADDRESS.

Essex Superior Court

TRUE ATTEST COPY

DEPUTY SHERIFF

THIS SUMMONS IS DIRECTED TO ___Comstar LLC___ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the  Essex  Superior          Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business,  Essex Superior          Court
    43 Appleton Way, Lawrence, MA 01841  (address), by mail or in person **AND**

    b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
    Randi A. Kassan, Milberg, Coleman, Bryson, Phillips, Grossman
    100 Garden City Plaza, Suite 500
    Garden City, NY 11530

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.



3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

## 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

## 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____ , Chief Justice on _____ , 20____

Clerk-Magistrate  Thomas H. Driscoll, Jr. _____

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____        Signature: _____

N.B.   TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date: _____

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br>2277CV00641 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Robert Woltag Individually and in his/her capacity And on behalf of all others similarly situated et al vs. Comstar, LLC | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|
| TO: Randi A Kassan, Esq.<br>Milberg Coleman Bryson Phillips Grossman, LLC<br>100 Garden City Plaza Suite 500<br>Garden City, NY 11530 | COURT NAME & ADDRESS<br>Essex County Superior Court - Lawrence<br>43 Appleton Way<br>Lawrence, MA 01841 |

## TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                    **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 10/12/2022 | |
| Response to the complaint filed (also see MRCP 12) | | 11/14/2022 | |
| All motions under MRCP 12, 19, and 20 | 11/11/2022 | 12/12/2022 | 01/10/2023 |
| All motions under MRCP 15 | 09/07/2023 | 10/10/2023 | 10/10/2023 |
| All discovery requests **and depositions** served and non-expert depositions completed | 07/03/2024 | | |
| All motions under MRCP 56 | 08/02/2024 | 09/02/2024 | |
| Final pre-trial conference held and/or firm trial date set | | | 12/30/2024 |
| Case shall be resolved and judgment shall issue by | | | 07/14/2025 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED<br>07/14/2022 | ASSISTANT CLERK<br>**Stefano J Cornelio** | PHONE<br>**(978)242-1900** |
|---|---|---|

Date ☒. 7/13/2022 6:46 PM Case 1:22-cv-11527-PBS    Document 1    Filed 09/16/22    Page 65 of 121
Superior Court - Essex
Docket Number

1

## COMMONWEALTH OF MASSACHUSETTS
### ESSEX, SUPERIOR COURT DEPARTMENT

ROBERT WOLTAG and MICHAEL FRECHETTE, individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

COMSTAR, LLC,

        Defendant.

C.A. No. 2277CV00641

**RECEIVED**

7/14/2022

Plaintiffs Robert Woltag and Michael Frechette ("Plaintiffs") bring this Class Action Complaint (the "Action") against Comstar, LLC ("Comstar" or "Defendant") for damages, equitable relief, and injunctive relief, as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.    Plaintiffs bring this Action against Comstar, LLC d/b/a Comstar Ambulance Billing Service, a New England-based "[a]mbulance billing, [c]ollection, [c]onsulting, ePCR [h]osting and [c]lient/[p]atient service to municipal and non-profit ambulance service,"[1] to seek damages for themselves and other similarly situated consumers or any other person impacted in the data breach at issue ("Class Members"), who they seek to represent with respect to damages, as well as other equitable relief, including, and without limitation, injunctive relief designed to protect the very sensitive information of Plaintiffs and Class Members. This very sensitive information is provided by the consumer for ambulance and/or healthcare related services and maintained by Defendant for its own pecuniary gain. Defendant acquires the sensitive and private information of

---

[1] https://www.comstarbilling.com, (last accessed June 30, 2022).

consumers directly from individuals or from municipalities and healthcare entities that use its services. Defendant also acquires consumer information through the course of its debt collection and account servicing activities[2]

2.    This Action arises from a data breach (hereinafter, the "Data Breach") in which Defendant exposed a trove of very sensitive information, (collectively, the "Private Information"), inclusive of Personally Identifiable Information ("PII"), specifically names, dates of birth, drivers' license information, and Social Security numbers; and Protected Health Information ("PHI"), specifically information regarding medical assessments, medication administration, and health insurance information; as well as financial account information.[3]

3.    Despite Defendant's statement that "security of information in Comstar's care is one of [Comstar's] highest priorities and [Comstar has] strict security measures to protect information in [Comstar's] care," Comstar failed to provide timely, accurate, and adequate notice to Plaintiffs and Class Members whose Private Information was compromised in the Data Breach alleged herein. Specifically:

   a.    With respect to timeliness, Defendant's *Notice*, was disseminated on May 25, 2022, nearly two months after Comstar first discovered suspicious activity on their servers and over a month after the investigation by Comstar concluded that unauthorized accesses of its servers had occurred;

   b.    With respect to accuracy, Defendant's *Notice* fails to apprise affected individuals of the scope of the intrusions and only states that "the investigation was unable to confirm what specific information" belonging to Plaintiffs and Class Members was "subject to unauthorized access"; and,

   c.    With respect to adequacy, Defendant's *Notice* does not state how the Data

---

[2] https://www.wilmingtonma.gov/home/news/comstar-ambulance-billing-security-breach, (last accessed June 30, 2022).
[3] Notice of Data Incident (May 25, 2022), (hereinafter, the "*Notice*"), at https://secureservercdn.net/45.40.146.94/15b.604.myftpupload.com/wp-content/uploads/2022/06/noticeofdataevent_06162022.pdf, (last accessed June 30, 2022).

Breach occurred, how long the Data Breach lasted, when the Data Breach began, and other pertinent information.

4.      As a result of this delayed response, Plaintiffs and Class Members were unaware that their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. Additionally, the failure of Defendant to specify what information was actually viewed and/or exfiltrated from its systems prevents Plaintiffs and members of the Class from taking proper remedial efforts.

5.      On or about May 25, 2022, Defendant began notifying consumers (via the Notice posted on its website), the Department of Health and Human Services ("HHS"), state Attorneys General and other Class Members about a widespread data breach involving sensitive PII of approximately 68,957 individuals. As Defendant explained in its required notice letter, it discovered that its network had been breached by an "unauthorized individual." Defendant admits in its notice letter that, as a result of its failure to protect consumer information, the cybercriminal(s) "acquired" the Private Information of Class Members, including Plaintiffs.

6.      Plaintiffs and Class Members' unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions, and due to its utter failure to protect Class Members' sensitive data. Hackers obtained consumers' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The risks to these persons will remain for their respective lifetimes.

7.      Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect consumers' Private Information; (ii) warn consumers of its inadequate information security practices; and (iii) effectively monitor Defendant's network for security vulnerabilities and incidents. Defendant's conduct amounts, at least, to negligence and violates federal and state statutes.

8.      Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include, but are not limited to: (i) lost or diminished value of Private

Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; change their usernames and passwords on their accounts; investigate, correct and resolve unauthorized debits; deal with spam messages and e-mails received subsequent to the Data Breach, (v) charges and fees associated with fraudulent charges on their accounts, and (vi) the continued and certainly an increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information. These risks will remain for the lifetimes of Plaintiffs and Class Members.

9.      Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or at the very least negligently failing to take and implement adequate and reasonable measures to ensure that its customers' Private Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to damages, injunctive and other equitable relief.

## II. PARTIES

### *Plaintiff Robert Woltag*

10.      Plaintiff Robert Woltag is a resident and citizen of the commonwealth of Massachusetts. Plaintiff Woltag resides in Massachusetts and received the *Notice* related to the Data Breach as alleged herein on or about June 7, 2022.

### *Plaintiff Michael Frechette*

11.      Plaintiff Michael Frechette is a resident and citizen of the commonwealth of

Massachusetts. Plaintiff Frechette resides in Massachusetts and received the *Notice* related to the Data Breach as alleged herein on or about June 7, 2022.

**Defendant Comstar, LLC**

12.     Defendant Comstar, LLC is an ambulance billing service and consumer account servicer incorporated in Massachusetts and with its principal place of business in Rowley, Massachusetts.

## III. JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this case because the amount in controversy exceeds the sum of $50,000.00.

14.     This Court has personal jurisdiction over Defendant because Defendant transacts business, contracts to supply services, and has caused tortious injury by act or omission within the Commonwealth of Massachusetts and within Essex County. In addition, Defendant is a corporation in good standing with a majority (if not all) of its business in the Commonwealth of Massachusetts, thus rendering the exercise of personal jurisdiction by this Court necessary and proper.

15.     Venue is proper in Essex County because Defendant has its principal place of business and conducted the activities that gave rise to this claim in this county.

## IV. FACTUAL ALLEGATIONS

**Defendant's Business**

16.     Defendant Comstar, LLC d/b/a Comstar Ambulance Billing Service is a New England-based "[a]mbulance billing, [c]ollection, [c]onsulting, ePCR [h]osting and [c]lient/[p]atient service to municipal and non-profit ambulance service."[4]

---

[4] https://www.comstarbilling.com, (last accessed June 30, 2022).

17.    In the course of doing business, Comstar collects very sensitive information about consumers including their private information.

18.    This very sensitive information is provided by the consumer for ambulance-related and healthcare related services; or, in some cases is provided by entities like municipalities that contract for Defendant's services, including its debt collection activities.[5]

19.    According to Comstar's Privacy Policy (hereinafter, the "Policy"), which can be found on Defendant's website, effective April 14, 2003 and revised February 11, 2013, consumer "health information is personal, and Comstar is committed to protecting it. [Comstar is] required by law to maintain the privacy of health information that could be [identifying.]"[6] However, Comstar fails to state what private information that it collects with respect to specific Class Members in its Policy – and because much of the information that Comstar collects on Class Members comes from municipalities or other entities that contract with Defendant, Class Members are unaware as to exactly what information Comstar maintains and what Comstar allowed to be accessed in the Data Breach.

20.    Because the set of data that was exposed in the Data Breach is identified in Defendant's *Notice*, it can be assumed that Comstar collects the following consumer data : names, dates of birth, drivers' license information, Social Security numbers, medical assessments, medication administration, health insurance information; and financial account information.[7]

21.    The Privacy Policy fails to discuss how Constar uses consumer PII, but they do

---

[5] https://www.wilmingtonma.gov/home/news/comstar-ambulance-billing-security-breach, (last accessed June 30, 2022).

[6] https://www.comstarbilling.com/privacy-policy/, (last accessed Jul. 1, 2022)(hereinafter, the "*Policy*").

[7] Notice of Data Incident (May 25, 2022), (hereinafter, the "*Notice*"), at https://secureservercdn.net/45.40.146.94/15b.604.myftpupload.com/wp-content/uploads/2022/06/noticeofdataevent_06162022.pdf, (last accessed June 30, 2022).

address how they "use or disclose ... PHI," uses and disclosures that require written consent, rights with respect to PHI, notification in the event of an unauthorized use or disclosure, as well as contact information.

22.     With respect to uses and disclosures that require written consent, Defendant states, "Any.... use or disclosure of PHI... will be made with your written authorization."[8] However, in this Data Breach, Plaintiffs and Class Members did not consent to use or disclosure of PHI to the unauthorized actors who accessed the Private Information discussed herein.

23.     With respect to notification of an unauthorized use or disclosure, Defendant states, "that notification... must contain.... "a description of the unauthorized use or disclosure, including the unauthorized use of date or its discovery, if known" as well as "a description of the type of unsecured PHI that was used or disclosed." However, Defendant's Notice fails to do either: the Notice fails to provide the dates of unauthorized use and the Notice does not say exactly what PHI was subject to use or disclosure.[9]

24.     Thus, Defendant's *Notice* does not abide by their own Privacy Policy.

25.     Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including HIPAA.

26.     The patient information held by Defendant in its computer system and network included the Private Information of Plaintiffs and Class Members. Defendant voluntarily assumed custody of Plaintiffs' and Class members' PII and PHI for its own profit. Defendant was aware of its obligations, particularly with respect to consumer PHI, as demonstrated by its Privacy

---

[8] *Policy.*
[9] *Notice.*

Policy.

27.    By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

28.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

29.    Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

### *The Data Breach*

30.    Publicly, on May 25, 2022 via a "Notice of Data Event" posted on its website and disseminated to affected individuals by mail, Comstar disclosed that actors with "unauthorized access" accessed "certain systems on [Comstar's] network."[10] The *Notice* did not state when the unauthorized access began or when the unauthorized access ended, only that Comstar discovered it on or about March 26, 2022 and "took steps to secure [Comstar's] network."[11]

31.    In this *Notice*, Defendant publicly stated the Private Information "varied by individual but may have included" the following information: name, date of birth, medical assessment and medication administration, health insurance information, driver's license, financial account information, and Social Security number.[12]

---

[10] *Notice.*
[11] *Id.*
[12] *Id.*

32.    Comstar reported that approximately 68,957 victims had their Private Information exposed in the Data Breach. [13]

33.    It is likely the Data Breach was targeted at Defendant due to its status as a healthcare related entity that collects, creates, and maintains both PII and PHI.

34.    Upon information and belief, the targeted Data Breach was expressly designed to gain access to private and confidential data, including (among other things) the PII and PHI of patients like Plaintiffs and the Class Members.

35.    Because of the Defendant's failure to properly safeguard Plaintiffs' and Class Members' Private Information, data thieves were able to gain unauthorized access to Defendant's IT systems and were able to compromise, access, and acquire the protected Private Information of Plaintiffs and Class Members.

36.    Defendant had obligations created by HIPAA, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

37.    Defendant's data security obligations were particularly important and should have been apparent given the substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

38.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. [14] Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry. [15] The 330

---

[13] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, (last accessed Jul. 7, 2022).

[14] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.

[15] *Id.*

reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[16]

39.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

40.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

41.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[18]

42.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[16] *Id.*

[17]    FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-  secret-service-warn-of-targeted-ransomware (last visited Jan. 25, 2022).

[18]    *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

### *Defendant Fails to Comply with FTC Guidelines*

43.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

44.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[19] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[20]

45.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

46.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and

---

[19] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 15, 2021).
[20] *Id.*

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47.     These FTC enforcement actions include actions against healthcare related providers like Defendant. *See, e.g., In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

48.     Defendant failed to properly implement basic data security practices.

49.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

50.     Die to the nature of the information Defendant chose to custody Defendant was at all times fully aware of its obligation to protect the PII and PHI of consumers. As an entity that custodies PHI and PII Defendant was also aware of the significant repercussions that would result from its protect that information from unauthorized access.

### Defendant Fails to Comply with Industry Standards

51.     Experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

52.     Several best practices have been identified that at a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

53.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

54.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

55.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach and the resulting harm to Plaintiffs and the Class.

### *Defendant Fails to Comply with HIPAA*

56.    HIPAA requires covered entities like Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information.

57.    Covered entities (including Defendant) must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical,

and administrative components.

58.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

59.    A Data Breach such as the one Defendant experienced is also considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

>    A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40

60.    Data breaches where an unauthorized individual gains access to PHI are also Security Incidents under HIPAA because they impair both the integrity (data is not interpretable) and availability (data is not accessible) of patient health information:

>    The presence of ransomware (or any malware) on a covered entity's or business associate's computer systems is a security incident under the HIPAA Security Rule. A security incident is defined as the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. See the definition of

security incident at 45 C.F.R. 164.304. Once the ransomware is detected, the covered entity or business associate must initiate its security incident and response and reporting procedures. See 45 C.F.R.164.308(a)(6).[21]

61.    Similarly,

62.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards and standards of care mandated by HIPAA regulations.

**Defendant's Breach**

63.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

> a.    Failing to maintain an adequate data security system to reduce the risk of data breaches;
>
> b.    Failing to adequately protect patients' Private Information;
>
> c.    Failing to properly monitor its own data security systems for existing intrusions;
>
> d.    Failing to train its employees in the proper handling of emails containing the means by which the cyberattacks were able to first access Defendant's networks, and to maintain adequate email security practices;
>
> e.    Failing to put into place proper procedures, software settings, and data

---

[21] *See* https://www.hhs.gov/sites/default/files/RansomwareFactSheet.pdf at 4.

security software protections to adequately protect against a blunt force intrusion;

f.    Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i.    Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l.    Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

m.    Failing to train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

n.    Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption);

o.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

p.    Failing to adhere to industry standards for cybersecurity.

64.    As the result of antivirus and malware protection software in dire need of security updating, inadequate procedures for handling phishing emails or emails containing viruses or other malignant computer code, and other failures to maintain its networks in configuration that would protect against cyberattacks like the ransomware intrusion here, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access and compromise Defendant's IT systems, which contained unsecured and unencrypted Private Information.

65.    Accordingly, as outlined below, Plaintiffs and Class Members now face an increased

risk of fraud and identity theft.

### *Data Breaches Cause Disruptions and Put Consumers at Risk*

66.     Data breaches at healthcare related providers like Defendant are especially problematic because the breaches can negatively impact the overall daily lives of individuals affected by the attack.

67.     For instance, loss of access to patient histories, charts, images, and other information forces providers to limit or cancel patient treatment because of the disruption of service.

68.     This leads to a deterioration in the quality of overall care patients receive at facilities affected by data breaches.

69.     Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[22]

70.     Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[23]

71.     Similarly, data breach incidents cause patients issues with receiving care that rise above the level of mere inconvenience. The issues that patients encounter as a result of such incidents include, but are not limited to:

      a.  rescheduling their medical treatment;

---

[22] *See* Nsikan Akpan, Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart- attacks (last visited Jan. 25, 2022).

[23] *See* Sung J. Choi et al., Cyberattack Remediation Efforts and Their Implications for Hospital Quality, 54 Health Services Research 971, 971-980 (2019). Available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited Jan. 25, 2022).

    b.  finding alternative medical care and treatment;

    c.  delaying or foregoing medical care and treatment;

    d.  undergoing medical care and treatment without medical providers having access to a complete medical history and records; and

    e.  inability to access their medical records.[24]

72.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[25]

73.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, taking over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such

---

[24] *See, e.g.,* Lisa Vaas, Cyberattacks Paralyze, and Sometimes Crush, Hospitals, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals//_(last visited Jan. 25, 2022); Jessica David, Data Breaches Will Cost Healthcare $4B in 2019. Threats Outpace Tech, Health IT Security (Nov. 5, 2019), https://healthitsecurity.com/news/data-breaches-will-cost-healthcare-4b-in-2019-threats-outpace-tech - :~:text=November 05, 2019 - Healthcare data,per each breach patient record (last visited Jan. 25, 2022).

[25] *See* U.S. Gov. Accounting Office, GAO-07-737, "Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown" (GOA, 2007). Available at https://www.gao.gov/new.items/d07737.pdf. (last visited Jan. 25, 2022).

as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

74.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

75.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

76.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

77.     A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[27]

---

[26] *See* IdentityTheft.gov, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Jan. 25, 2022).

[27] *See* Jason Steele, Credit Card and ID Theft Statistics, CreditCards.com (Oct. 23, 2020) https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php. (last visited Jan. 25, 2022).



78.    Moreover, theft of Private Information results in the loss of a valuable property right.[28]

79.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

80.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment,

---

[28] *See*, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

insurance and payment records, and credit report may be affected."[29]

81.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and

other healthcare service providers often purchase PII and PHI on the black market for the purpose

of target marketing their products and services to the physical maladies of the data breach victims

themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their

insureds' medical insurance premiums.

82.    It must also be noted there may be a substantial time lag – measured in years –

between when harm occurs and when it is discovered, and also between when Private Information

and/or financial information is stolen and when it is used.

83.    According to the U.S. Government Accountability Office, which conducted a study

regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held
>
> for up to a year or more before being used to commit identity theft. Further, once
>
> stolen data have been sold or posted on the Web, fraudulent use of that
>
> information may continue for years. As a result, studies that attempt to measure
>
> the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

84.    Private Information is such a valuable commodity to identity thieves that once the

information has been compromised, criminals often trade the information on the "cyber black-

market" for years.

85.    There is a strong probability that entire batches of stolen information have been

---

[29]  *See* Federal Trade Commission, What to Know About Medical Identity Theft,
https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft    identity-theft
(last visited Jan. 25, 2022).

dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

86.     Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

87.     Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[30] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

88.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[31] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[32] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

89.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

90.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be

---

[30] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Jan. 25, 2022).
[31] Identity Theft and Your Social Security Number, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 25, 2022).
[32] *Id.* at 4.

effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

91.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

92.     Medical information is especially valuable to identity thieves.

93.     According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016 – the same as a Facebook account.[33] That pales in comparison with the asking price for medical data, which was selling for $50 and up.[34]

94.     Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

95.     For this reason, Defendant knew or should have known about these dangers and strengthened its data security accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### *Plaintiffs' and Class Members' Damages*

96.     To date, Defendant has done nothing to provide Plaintiffs and the Class Members with relief for the damages they have suffered as a result of the Data Breach. According to the *Notice*, Defendant will not even offer credit monitoring or identity theft protection services to the victims of the Data Breach. Instead, Defendant tells affected individuals "[w]e are notifying

---

[33] *See* Omri Toppol, Email Security: How You Are Doing It Wrong & Paying Too Much, LogDog (Feb. 14, 2016), https://getlogdog.com/blogdog/email-security-you-are-doing-it-wrong/ (last visited Jan. 25, 2022).

[34] *See* Vaas, Cyberattacks, *supra*, n. 28.

potentially impacted individuals, including you, so that you may take steps to help protect your information, should you feel it is appropriate to do so." This despite telling consumers in the same letter to "remain vigilant against incidents of identity theft" and to consider placing fraud alerts and credit freezes on their accounts. Clearly, Defendant recognizes the imminent and actual harm faced by Plaintiffs and members of the Class even if it does nothing to mitigate that harm.

97.    Plaintiffs and Class Members will be required to pay for credit monitoring or identity theft protection services out of their own pocket. The cost for credit monitoring to consumers can be as much as $360 per year for many years.[35] Moreover, Defendant's refusal to mitigate the fallout from the Data Breach means that Plaintiffs and Class Members will be required to devote more time and effort to remedy the effects than they otherwise must.

98.    Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

99.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, and similar identity theft.

100.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

101.    Plaintiffs and Class Members will also incur out-of-pocket costs for protective

---

[35] https://compliancy-group.com/the-hidden-costs-of-a-data-breach/

measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

102.    Plaintiffs and Class Members suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of their Private Information, a form of property that Defendant obtained from Plaintiffs and Class Members; (b) violation of their privacy rights; and (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

103.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

> a. Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;
>
> b. Purchasing credit monitoring and identity theft prevention;
>
> c. Placing "freezes" and "alerts" with reporting agencies;
>
> d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;
>
> e. Contacting financial institutions and closing or modifying financial accounts; and
>
> f. Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized

activity for years to come.

104.     Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

### Plaintiffs' Experiences

#### Plaintiff Woltag's Experience

105.     Plaintiff Woltag's information came into the custody of Defendant and was compromised in the Data Breach.

106.     Since the Data Breach, Plaintiff Woltag has had an increase in fraud alerts and has had to correspond with credit reporting agencies as a result of these fraud alerts.

107.     Plaintiff Woltag has spent a significant number of hours reviewing his bank accounts, contacting his bank, and contacting other businesses, and will continue to spend valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

108.     Additionally, Woltag is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

109.     Plaintiff stores any documents containing his sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

110.     Plaintiff suffered actual injury from having his PII and PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of PII

and PHI, a form of property that Defendant obtained; (b) violation of privacy rights;(c) the likely theft of PII and PHI; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

111.    As a result of the Data Breach, Plaintiff Woltag has also suffered emotional distress as a result of the release of his PII and PHI, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of identity theft and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

112.    As a result of the Data Breach, Plaintiff Woltag anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Woltag will continue to be at present, imminent, and continued increased risk of identity theft and fraud for years to come.

113.    Plaintiff Woltag has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of unauthorized third parties and possibly criminals.

114.    Plaintiff Woltag has a continuing interest in ensuring that his PII and PHI, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Frechette's Experience*

115.    Plaintiff Frechette's information came into the custody of Defendant and was compromised by way of the Data Breach.

116.    Plaintiff Frechette has spent a significant number of hours reviewing his bank

accounts, contacting his bank, and contacting other businesses, and will continue to spend valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

117.    Additionally, Plaintiff Frechette is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

118.    Plaintiff Frechette stores any documents containing his sensitive PII or PHI in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

119.    Plaintiff Frechette suffered actual injury from having his PII and PHI compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of PII and PHI, a form of property that Defendant obtained; (b) violation of privacy rights;(c) the likely theft of PII and PHI; and (d) imminent and impending injury arising from the increased risk of identity theft and fraud.

120.    As a result of the Data Breach, Plaintiff Frechette has also suffered emotional distress as a result of the release of his PII and PHI, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of identity theft and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

121.    As a result of the Data Breach, Plaintiff Frechette anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Frechette will continue to be at present, imminent, and continued

increased risk of identity theft and fraud for years to come.

122.    Plaintiff Frechette has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII and PHI being placed in the hands of unauthorized third parties and possibly criminals.

123.    Plaintiff Frechette has a continuing interest in ensuring that his PII and PHI, which, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

124.    Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated:

125.    The Class that Plaintiffs seek to represent is defined as follows:

All persons residing in the United States whose Private Information was compromised in the Data Breach announced by Defendant on or about May 25, 2022 (the "Class").

126.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

127.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

128.    **Numerosity**. The members of the Class are so numerous that joinder of all

members is impracticable. Defendant has identified and sent notice to approximately 68,957 persons whose Private Information may have been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendant's records.

129.    **Commonality and Predominance.** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.  Whether Defendant had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.  Whether Defendant had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.  Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.  When specifically Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which

permitted the Data Breach to occur;

j.  Whether Plaintiffs and Class Members are entitled to actual damages, nominal damages, and/or punitive damages as a result of Defendant's wrongful conduct;

k.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct, and;

l.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

130.    Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiffs seeks to enforce, on behalf of themselves and the other members of the Class, in that all the Plaintiffs and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

131.    **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

132.    **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to that of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the

damages he has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

133.    **Superiority.** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against corporations. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

134.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

135.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

136.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

137.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

138.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## VI. CAUSES OF ACTION

### FIRST COUNT

### NEGLIGENCE

(On behalf of Plaintiffs and the Class)

139.    Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

140.    As a condition of any person or entity using the services of Defendant, Class Members are obligated to (or an entity provides) provide Defendant with certain Personally Identifiable Information, specifically name, date of birth, driver's license information, and Social Security number; Protected Health Information, specifically medical assessment, medication administration, and health insurance information; as well as financial account information.

141. Defendant's acceptance and maintenance of this information is for its own pecuniary gain and as part of its regular business activities.

142. Plaintiffs and Class Members, and the entities that provided said PII – such as a municipality, entrusted this Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

143. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

144. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of their consumers' Private Information involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

145. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' information in Defendant's possession was adequately secured and protected.

146. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' Private Information.

147. A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly in light of Defendant's business as a financial services firm, for which the diligent protection of Private Information is a continuous forefront issue.

148. Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew of should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and Class, the

critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

149.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiffs' and Class Members' Private Information, including basic encryption techniques freely available to Defendant.

150.    Plaintiffs and Class Members had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

151.    Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

152.    Defendant had and continues to have a duty to adequately and promptly disclose that the PII of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

153.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiffs and Class Members.

154.    Defendant has admitted that the Private Information of Plaintiffs and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

155.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and Class Members during the time the Private Information was within Defendant's possession or control.

156.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

157.     These foregoing frameworks are existing and applicable industry standards in the financial services industry, and Defendant failed to comply with these accepted standards thereby opening the door to the cyber incident and causing the data breach.

158.     Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

159.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect consumers' Private Information in the face of increased risk of theft.

160.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its consumers' Private Information.

161.     Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

162.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

163.     There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiff and Class. Plaintiffs' and Class Members' Private Information was lost and accessed as the proximate result of Defendant's failure to exercise

reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

164.    Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach or data breach.

165.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare, dental, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

166.    Defendant's violation of 45 C.F.R. § 164.530(c)(l) and related HIPAA provisions constitutes negligence *per se*.

167.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

168.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members.

169.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

170.    Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

171.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class.

172.    As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of consumers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (ix) the diminished value of Defendant's goods and services they received.

173.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

174.    Additionally, as a direct and proximate result of Defendant's negligence and

negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

## SECOND COUNT

### UNJUST ENRICHMENT

(On behalf of Plaintiffs and the Class)

175.    Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

176.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

177.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

178.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents or contracting partners and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

179.    Defendant was aware that any payment for its services from entities that provided consumer information was intended for it on behalf of the consumer as each individual for which Defendant maintained private information was identifiable via the information Defendant collected.

180.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

181.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and  Class  Members  by  utilizing  cheaper,  ineffective  security measures.  Plaintiffs  and  Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

182.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

183.    Defendant failed to secure Plaintiffs and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

184.   Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

185.   If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

186.   Plaintiffs and Class Members have no adequate remedy at law.

187.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

188. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

189. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## VII. PRAYER FOR RELIEF

190. Plaintiffs demand a trial by jury on all claims so triable.

## VIII. JURY TRIAL DEMAND

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class, and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected

through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v. prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.  requiring Defendant to conduct regular database scanning and securing checks;

xi.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal

identifying information to third parties, as well as the steps affected individuals

must take to protect themselves;

xvi.    requiring Defendant to implement logging and monitoring programs sufficient

to track traffic to and from Defendant's servers; and for a period of 10 years,

appointing a qualified and independent third party assessor to conduct a SOC 2

Type 2 attestation on an annual basis to evaluate Defendant's compliance with

the terms of the Court's final judgment, to provide such report to the Court and

to counsel for the class, and to report any deficiencies with compliance of the

Court's final judgment;

D.    For an award of damages, including actual, nominal, statutory, and consequential

damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

DATED:    July 13, 2022

Respectfully submitted,

*s/ Randi Kassan*

RANDI KASSAN

**MILBERG COLEMAN BRYSON**

**PHILLIPS GROSSMAN, PLLC**

100 Garden City Plaza, Suite 500

Garden City, New York 11530

Phone: (212) 594-5300

rkassan@milberg.com


GARY M. KLINGER*

**MILBERG COLEMAN BRYSON**

**PHILLIPS GROSSMAN, PLLC**

227 W. Monroe Street, Suite 2100

Chicago, IL 60606

Phone: (866) 252-0878

gklinger@milberg.com

*ATTORNEYS FOR PLAINTIFFS*

## 2277CV00641 Robert Woltag Individually and in his/her capacity And on behalf of all others similarly situated et al vs. Comstar, LLC

- Case Type:
- Torts
- Case Status:
- Open
- File Date
- 07/13/2022
- DCM Track:
- A - Average
- Initiating Action:
- Fraud, Business Torts, etc.
- Status Date:
- 07/13/2022
- Case Judge:
- 
- Next Event:
- 

| All Information | Party | Tickler | Docket | Disposition |
| --- | --- | --- | --- | --- |

### Docket Information

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
| --- | --- | --- | --- |
| 07/13/2022 | Case assigned to:<br>DCM Track A - Average was added on 07/14/2022 | | |
| 07/13/2022 | Complaint electronically filed. | 1 | Image |
| 07/13/2022 | Civil action cover sheet filed. | 2 | Image |
| 07/13/2022 | Demand for jury trial entered. | | |
| 09/01/2022 | Service Returned for<br>Defendant Comstar, LLC: Service through person in charge / agent | 3 | Image |

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts 2 The Superior Court |
|---|---|---|
| | | COUNTY Essex Superior Court (Salem) |

| Plaintiff ROBERT WOLTAG | Defendant COMSTAR, LLC |
|---|---|
| ADDRESS: Medford, MA. | ADDRESS: |
| | |
| | |
| Plaintiff: MICHAEL FRECHETTE | Defendant Attorney: |
| ADDRESS: Wilmington, MA. | ADDRESS: |
| | |
| | **RECEIVED** 7/14/2022 |
| | BBO: |
| Plaintiff Attorney: Randi Kassan | Defendant Attorney: |
| ADDRESS: Milberg Coleman Bryson Phillips Grossman, PLLC | ADDRESS: |
| 100 Garden City, Suite 500 | |
| Garden City, NY 11530 | |
| BBO: 568656 | BBO: |

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| BE1 | Fraud, Business Torts, etc. | A | ☒ YES  ☐ NO |

*If "Other" please describe: _____

| Is there a claim under G.L. c. 93A? | Is there a class action under Mass. R. Civ. P. 23? |
|---|---|
| ☐ YES  ☒ NO | ☒ YES  ☐ NO |

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date

    1. Total hospital expenses _____

    2. Total doctor expenses _____

    3. Total chiropractic expenses _____

    4. Total physical therapy expenses _____

    5. Total other expenses (describe below) _____

    [_____]

                         Subtotal (1-5): **$0.00**

B. Documented lost wages and compensation to date _____

C. Documented property damages to date _____

D. Reasonably anticipated future medical and hospital expenses _____

E. Reasonably anticipated lost wages _____

F. Other documented items of damages (describe below) in excess of 5,000,000

[_____]

                     TOTAL (A-F): **in excess of 5,000,000**

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Plaintiffs suffered from the unauthorized access and exfiltration of their private health information that was in the care and custody of Defendant Comstar LLC

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | | |
| | Total | |

Case 1:22-cv-11527-PBS     Document 1     Filed 09/16/22     Page 114 of 121

| Signature of Attorney/Unrepresented Plaintiff: X /s/ Randi Kassan | Date: July 13, 2022 |
|---|---|

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

<br>

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney/Unrepresented Plaintiff: X /s/ Randi Kassan | Date: July 13, 2022 |
|---|---|

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. | (A) |

### CN Contract/Business Cases

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A05 Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c. 231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

### PA Civil Actions Involving Incarcerated Party †

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (F) |
| PE1 Administrative Action involving an Incarcerated Party | (F) |

### TR Torts

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/ Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death - Non-medical | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

### RP Summary Process (Real Property)

| | |
|---|---|
| S01 Summary Process - Residential | (X) |
| S02 Summary Process - Commercial/ Non-residential | (F) |

### RP Real Property

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

### MC Miscellaneous Civil Actions

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10, § 28 | (X) |

### AB Abuse/Harassment Prevention

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E(X) | |

### AA Administrative Civil Actions

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 Mass Antitrust Act, G.L. c. 93, § 8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 Appeal Bond Denial | (X) |

### SO Sex Offender Review

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 SDP Petition, G.L. c. 123A, § 9(b) | (X) |

### RC Restricted Civil Actions

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112, § 12S(X) | |

## TRANSFER YOUR SELECTION TO THE FACE SHEET

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES    ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.

| Summons | CIVIL DOCKET NO.<br>2277CV00641 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

CASE NAME:

Robert Woltag, *et al* Individually and on behalf of all others similarly situated

Plaintiff(s)

vs.

Comstar LLC

Defendant(s)

Thomas H. Driscoll, Jr.    Clerk of Courts

Essex    County

COURT NAME & ADDRESS:

Essex Superior Court

---

THIS SUMMONS IS DIRECTED TO   *Comstar LLC*   (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the  Essex  Superior  Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

    a) Filing your **signed original** response with the Clerk's Office for Civil Business,  Essex Superior  Court 43 Appleton Way, Lawrence, MA 01841  (address), by mail or in person **AND**

    b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Randi A. Kassan, Milberg, Coleman, Bryson, Phillips, Grossman 100 Garden City Plaza, Suite 500 Garden City, NY 11530

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings:**

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger_____ , Chief Justice on _____, 20____ (Seal)

Clerk-Magistrate  Thomas H. Driscoll, Jr._____

<small>Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.</small>

---

PROOF OF SERVICE OF PROCESS

---



**Essex County Sheriff's Department, PO BOX 2019, Salem, MA 01970**

August 24, 2022

I hereby certify and return that on 8/23/2022 at 3:00 PM I served a true and attested copy of the summons, complaint, tracking order in this action in the following manner: To wit, by delivering in hand to Daniel Doherty, Registered Agent, for Comstar, LLC, 8 Essex Center Drive Peabody, MA 01960. Attestation fee ($5.00) Basic Service Fee ($30.00) Conveyance ($1.50) Postage and Handling ($1.00) Travel ($12.80) Total: $50.30

Deputy Sheriff  Paul Armitage

Date:

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERT WOLTAG and MICHAEL FRECHETTE, individually and on behalf of all others similarly situated, ) ) ) ) ) | |
| Plaintiff, ) ) | CIVIL ACTION NO. |
| v. ) ) | |
| COMSTAR, LLC ) ) | |
| Defendant. ) ) | |

### DECLARATION OF JEFF POST

I, Jeff Post, under penalty of perjury, declare as follows:

1.    I am over 18 years old, am suffering no disabilities, and am competent to execute this Affidavit.

2.    I am currently a Senior Project Manager at Epiq. Epiq provides legal process outsourcing services in the United States and internationally. The following facts are based on my personal knowledge and my review of and familiarity with pertinent records.

3.    Comstar, LLC ("Comstar") retained Epiq to send notice letters to persons whose personal information Comstar believed might have been affected by a data security incident on its information technology network.

4.    The total number of impacted individuals who have received notice as of today was 708,507. The breakdown of the 708,507 individuals by state is as follows:

| State | Impacted Individuals |
|-------|---------------------:|
|       | 383 |
| AA    | 1 |
| AB    | 3 |
| AE    | 6 |
| AK    | 31 |
| AL    | 124 |
| AP    | 1 |
| AR    | 66 |
| AS    | 1 |
| AZ    | 438 |
| BC    | 3 |
| CA    | 1,146 |
| CO    | 323 |
| CT    | 25,967 |
| DC    | 123 |
| DE    | 111 |
| FL    | 4,957 |
| GA    | 545 |
| GU    | 2 |
| HI    | 45 |
| IA    | 71 |
| ID    | 36 |
| IL    | 311 |
| IN    | 185 |
| KS    | 64 |
| KY    | 136 |
| LA    | 90 |
| MA    | 386,139 |
| MD    | 591 |
| ME    | 18,997 |
| MI    | 245 |
| MN    | 129 |
| MO    | 159 |
| MS    | 61 |
| MT    | 50 |
| NB    | 1 |
| NC    | 1,104 |
| ND    | 16 |
| NE    | 30 |
| NH    | 107,742 |
| NJ    | 1,390 |
| NM    | 68 |
| NS    | 5 |
| NV    | 141 |
| NY    | 5,024 |

| | |
|---|---|
| OH | 466 |
| OK | 83 |
| ON | 25 |
| OR | 134 |
| PA | 1,104 |
| PR | 136 |
| QC | 50 |
| RI | 117,552 |
| SC | 745 |
| SD | 20 |
| TN | 392 |
| TX | 917 |
| UT | 93 |
| VA | 765 |
| VI | 5 |
| VT | 28,509 |
| WA | 241 |
| WI | 124 |
| WV | 59 |
| WY | 26 |
| (blank) | |
| **Grand Total** | **708,507** |

I, Jeff Post, hereby declare that the statements contained in this declaration are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made under penalty of perjury and subject to 28 U.S.C. §1746 relating to unsworn falsification to authorities.

Dated:  September 14, 2022            By:  _____

                                                          Jeff Post